UNITED STATES DISTRICT COURT                          NOT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
_____

DARIUS BURRIS,

                                    Plaintiff,

                                                     **MEMORANDUM & ORDER**

            – against –

NASSAU COUNTY, DAVID SULZ, ANTHONY                    2:11-cv-0119 (ERK) (ARL)
NICOLIC, JOHN DEZELIC, CHRISTOPHER
FEHLING, DETECTIVES EMPLOYED BY
NASSAU COUNTY,

_____ Defendants. _____

Korman, *J*.:

        Darius Burris was arrested by Nassau and Suffolk County police officers at a house on

Commack Road in Long Island on October 21, 2009. Burris alleged that during his arrest, he was

beaten by Detective Anthony Nicolic, a Nassau County officer against whom Burris had a

pending lawsuit for excessive force arising out of a 2006 arrest. The arresting officers took

Burris to the 6th Precinct, where he was detained. Burris alleged that he was assaulted, strip

searched, threatened, and that Detectives Nicolic and David Sulz inserted a bullet into his

rectum. Burris further alleged that the officers said this assault was in retaliation for a pending

lawsuit Burris had filed against Det. Nicolic. Burris was transported to Nassau University

Medical Center ("NUMC") because of complaints of chest pain. He was examined, declared fit

for confinement, and was returned to jail. After complaining again of chest pain, he was

transported again to NUMC, where he told the medical staff that he believed he had a bullet in

his rectum following an assault. On this second visit, x-rays revealed a small bullet close to the

bottom of his anal cavity, above which he had substantial fecal matter. He was admitted to

NUMC, and expelled the bullet shortly thereafter.

Burris sued Nassau County and four Nassau County police detectives, alleging excessive force and failure to intervene claims under 42 U.S.C. § 1983, and pendent state-law tort claims for assault, battery, and intentional infliction of emotional distress ("IIED"). The case proceeded to trial before Judge Brodie in July 2017, but she declared a mistrial when the jury could not reach a verdict. Dkt. No. 156. The case was reassigned to me, and trial began on October 16, 2017. The jury returned a defense verdict on all counts but one—a single finding of intentional infliction of emotional distress against defendant Detective Anthony Nicolic—and awarded $1 in nominal damages. After the jury was discharged, defense counsel renewed his earlier pre-verdict motions pursuant to Federal Rules of Civil Procedure 50 and 59. Burris argued that the verdict was inconsistent, and ultimately filed a motion for a new trial on all of the causes of action on this and other grounds. The argument that the verdict was inconsistent was premised on the assumption that in order to return a finding on the IIED claim, the jury necessarily must have found that Burris had been assaulted, notwithstanding the fact that the jury returned a verdict in favor of the defendants on assault and battery causes of action.

I.   *Evidence at Trial*

On retrial, sixteen witnesses testified over six days, including three treating physicians at NUMC, Trial Transcript 149–70, 869–914, 1024–1153, and over a dozen exhibits were entered into evidence, Tr. 343, 586, 829, 1013, including a volume of medical records, Tr. 640. But early on, Burris's own evidence raised troubling questions about his account. On Burris's first visit to NUMC, x-rays were taken only of his chest and wrist because he had complained of injuries to these areas. Tr. 1025, 1027. The x-rays were negative. Tr. 1027–28. No x-rays were taken of his abdomen, because on that "first admission, he didn't complain anything. [sic] The second admission, he reported somebody inserted a bullet in his rectum." Tr. 1054.

On this second admission, Burris complained that a bullet had been inserted into his rectum. An x-ray ("x-ray B-1") showed a small metal object—ostensibly the bullet—at the bottom of his anal cavity, beneath a significant amount of stool. Tr. 153–54. A subsequent x-ray ("x-ray B-2"), taken a few hours later, showed that Burris had had a bowel movement, and that the bullet had moved up into Burris's colon. Tr. 166. Dr. Rashmikant Baxi, who read the x-rays, testified to what common sense dictated: Burris had a bowel movement between these x-rays, so the bullet should have been expelled, and in any event, should not have moved "up." Tr. 158–59, 166. Unless, of course, Burris inserted it himself after it was passed. *See* Tr. 1060, 1137.

A. Burris's Testimony

Burris gave contradictory testimony on a number of issues. *See, e.g.*, Tr. 556–60, 655–57, 671–72, 673–74. Most significantly, Burris contradicted the x-ray evidence from his medical records by testifying that he was constipated in the hospital and did *not* have a bowel movement until the date of his release on October 28, 2009, six days after his admission, long after the first x-ray was taken. *See* Tr. 497, 499, 500, 502–03. This caused me to raise a concern at sidebar about how this testimony conflicted with already-troubling x-ray evidence showing Burris had had a bowel movement the day after his admission. I told the parties, "Unless I'm reading it wrong what I'm hearing today is bordering on perjury." Tr. 513–14. Shortly after, I repeated, "I am trying my best to be fair, but I am greatly troubled by this. If the allegations were true, I would be very troubled, but I am greatly troubled by whether he is telling a truthful story or not." Tr. 519; *see also* Tr. 643–44 ("The Court: . . . because [Dr. Baxi] showed on the first x-ray there was fecal matter and on the second x-ray [taken the following day] it was gone, and if, to me, that was the most significant aspect of his testimony and it is a real question. I mean, he would have expelled that when he moved his bowels."). Not surprisingly, the day after Burris heard me

raise my concern, his testimony changed. As it turned out, he had, in fact, had a bowel movement in the hospital before October 28th, but it was "very small" and "wasn't enough, to, you know, tell the doctor about it." Tr. 649–50.

B. The Evidence Contradicting Burris's Story

Shawsharnold Stokes testified that while he and Burris were in jail together, Burris had bragged about inserting the bullet into his own rectum to concoct a § 1983 case against the officers. Tr. 774–76, 785–86, 794, 796. Indeed, Burris's ER records, made by the consulting gastroenterologist, contained the following notation:

> "Foreign body in rectum
> no evidence of a wound
> (illegible)
> ? self insertion
> Foreign body should be forced spontaneously with bowel movement – pt advised to
> retrieve after bm"

*See* Def. Ex. B-89, Dkt. No. 205; Tr. 1050, 1051–52. And finally, a third story of the bullet emerged from Burris's NUMC records: "[T]he resident reported that the [Burris] said that he was assaulted in jail by an inmate and a foreign body was inserted." Tr. 1043.

As the trial unfolded, even more evidence cast doubt on Burris's account. Despite Burris's claim that before he was transported to NUMC for the first time, he had told the emergency medical technician ("EMT") "something was stuck up my rectum," Tr. 656, the EMT testified that Burris never made any such complaints:

> Q: What treatment did you provide with regard to an alleged sodomy?
> A: I'm not aware of any.
> Q: So none?
> A: There was no treatment for that.
> Q: Were you told about an alleged sodomy?
> A: No, I was not. . . .
> Q: What kind of notes, if any, would you take?
> A: In that case, if there was a claim of sodomy, it would be listed on the pre-
> hospital care report.

> Q: And is it listed on the pre-hospital care report?
> A: No, it's not.
> The Court: Forget about the label sodomy. Did he tell you that a bullet had been placed in his rectum?
> A: No.
> Q: Did he even mention his rectum at all?
> A: No.

Tr. 842–43. Moreover, the EMT also contradicted Burris's testimony that he had shown them that his shirt had blood and feces. *Compare* Tr. 659 *with* Tr. 842 ("Q: Were you shown any blood or feces on his clothing?" A: No."). The EMT also confirmed that he had taken Burris's blood pressure, which measured at 122 over 88. Tr. 840–41. But when Burris was confronted with this relatively normal blood pressure reading taken at the precinct, he claimed that such a reading would "emphatically not be true . . . It's most likely not possible for [a person] to have that type of blood pressure after being in a fight." Tr. 657–58.

This is not all. Burris was seen in the ER by the same physician, Dr. Rolando Roman, on both of his visits to NUMC on the night of the alleged assault. Contrary to Burris's testimony that on his first hospital visit he had complained about everything that had happened to him, including the bullet, Tr. 648, the hospital records from that visit indicated that Burris complained only about chest, shoulder, and wrist pain. Tr. 1025, 1027. In response to these complaints, multiple x-rays were taken, but they showed no fractures or injuries. Tr. 1027–28. This also contradicted Burris's own testimony that he had no x-rays taken on that first visit at all. Burris made no complaint regarding his rectum. Tr. 1028. As Dr. Roman testified,

> Q: Did Mr. Burris complain about either alleged sodomy or something inserted in his rectum that evening in the ER?
> A: The first time? No.

Tr. 1029. Dr. Roman also testified that if Burris had made such a complaint, it would have been noted in the hospital record. Tr. 1028.

After this examination by Dr. Roman, Burris was cleared to be taken back to jail. Tr. 490. But he returned to the hospital after complaining again of chest pain. Tr. 491, 494. On this second visit, x-rays were taken of his abdomen. When asked why those x-rays were taken on the second admission, Dr. Roman replied that it was only on "[t]he second admission [that] he reported somebody inserted a bullet in his rectum." Tr. 1054. Burris complained of a "foreign body in rectum," Tr. 1033, but there was "no rectal bleeding" or pain, Tr. 1047. And Burris refused a rectal exam. Tr. 1049.

Dr. Nalini Kanth, the chair of radiology at NUMC, testified that she also read Burris's x-rays during his hospital stay. Tr. 869–70. In particular, she testified that x-rays revealed no injuries to his chest or wrist from the alleged assault, Tr. 871–72, and confirmed that x-ray B-1 showed a small object located approximately "one and a half inches" inside the anal canal, Tr. 887–88, and fecal matter above that, Tr. 872–74. She further testified that x-ray B-2, taken from the same position, showed that the fecal matter had passed out, likely due to a bowel movement, Tr. 874–75—just as the consulting GI said it would. Nevertheless, the bullet itself had somehow moved "higher," Tr. 884, even though "normal movement" would push out a foreign object during a bowel movement. Tr. 876. She also testified about additional x-ray films, taken after Burris's bowel movement, depicting the bullet in slightly different places within the colon, noting that once an object was inside the mobile sigmoid colon, it was "within the range of what we see" to observe the bullet move slightly. Tr. 908–09, 911–12.

Dr. Baxi also testified that, based on his education and experience, he felt competent to testify that it was "not natural" for the bullet to move from where it was in x-ray B-1 to where it was in B-2, although he was not in a position to opine as to *how* the bullet moved. Tr. 169–70. Dr. Roman, whose testimony was described in part above, also read the x-rays and confirmed

what his colleagues had previously testified: the fecal matter observable on x-ray B-1 was gone on B-2, Tr. 1044, and it was "not natural" for the bullet to move up, particularly after a bowel movement, Tr. 1055. When asked if the bullet could move upward from the rectum into the colon, Dr. Roman stated, "Unless somebody put it inside." Tr. 1060. When Dr. Roman looked at the two x-rays again on redirect, I asked him, "Well, what I don't understand is how is this possible if he had a bowel movement?" Dr. Roman replied, "The bullet came out." Tr. 1137.

Burris's attorneys then attempted to introduce medical case reports to ask Dr. Roman about a phenomenon called "proximal migration." Tr. 1070. I allowed this questioning to continue outside the presence of the jury, Tr. 1077, but ultimately I excluded the case reports, Tr. 1090–92. Nevertheless, I allowed one question to be put to the jury without referencing the excluded literature: "Doctor, is it possible for a bullet the size of what you saw on that x-ray to move upward, even though you have testified that it is not natural?" Tr. 1097. Dr. Roman responded, "It's possible though it's not natural." Tr. 1098. Burris's counsel continued without objection, "Doctor, is it possible for a bullet of the size that you saw in the x-ray that was shown to you to ascend from the anal canal into the rectum and then on to the sigmoid colon?", to which Dr. Roman replied, "It's possible." Tr. 1098. These hypotheticals made no mention of the fact that this bullet was under a significant amount of fecal matter that presumably would have obstructed any upward movement of the bullet.

## II.    *The Parties' Motions Under Rule 50 and Rule 59*

At the end of testimony, anticipating that both sides would rest the following morning, I directed the parties to make any motions they planned to make at the close of evidence. Tr. 1155–56. Defense counsel moved under Rule 50 for judgment as a matter of law and under Rule 59 for a new trial. Tr. 1156, 1167. During the colloquy on the motion, I observed that it was

"unequivocal and uncontradicted" that Burris had had a bowel movement between the first and second x-rays. Tr. 1158. That would mean that after the bullet was expelled, Burris had likely reinserted the bullet himself, and that "he . . . basically testified falsely through most of his testimony about what happened afterwards." *Id.* Nevertheless, I reserved decision on defendants' motions. Tr. 1167.

The jury returned the verdict described earlier: a defense verdict on all counts except one count of intentional infliction of emotional distress against Det. Nicolic, for which it awarded $1 in nominal damages. Tr. 1338–43. Defendants renewed the Rule 50 and 59 motions following the verdict on the grounds, *inter alia*, that "if [the jury is] to find that this bullet wasn't inserted into Mr. Burris's rectum [by Det. Nicolic], that a finding of intentional infliction of emotional distress on defendant Anthony Nikolic [sic] is a misunderstanding of the law." Tr. 1345.

Burris's counsel remarked, "We believe that the verdict suggesting that they found Mr. Nikolic [sic] liable for intentional infliction of emotional distress and not for assault and battery, I think it's inconsistent and contrary to the weight of the evidence based on the, based on the facts of the encounter, you know, at Commack Road." Tr. 1346. He continued, "The point I'm making is to the extent there is a finding against Mr. Nikolic [sic] that there was an intentional infliction of emotional distress, when there is evidence of assault at Commack Road and battery at Commack Road, that, you know, finding in our view can be altered under Rule 50." Tr. 1346. Burris's counsel seemed to be suggesting that, under Rule 50, I could *add* findings of liability for assault and battery against Det. Nicolic to make the verdict consistent with the finding of IIED. This is obviously not the function of Rule 50. Nevertheless, I reserved decision on all the post-verdict motions. Tr. 1352–53.

**Discussion**

I. *Burris's Rule 59 Motion*

Post-trial, Burris moved for a new trial on all causes of action under Rule 59, on the ground that a finding of liability against Det. Nicolic for IIED, without a finding of assault and battery, was an inconsistent verdict. Mot. 1. He also argued that nominal damages were unavailable for IIED because a finding of liability necessarily meant the jury believed Burris had suffered "severe emotional distress." *Id.* In fact, as discussed below, the opposite is true. Burris also moved on the ground that I improperly allowed the NUMC physicians to testify as medical experts, and that I had prejudiced the trial with the questions I asked them. *Id.* I deny Burris's motion on both grounds.

A. <u>Burris's Rule 59 Motion on the Grounds of an Inconsistent Verdict</u>

When a jury verdict presents an "apparent inconsistency, [the court] 'must adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" *Ali v. Kipp*, 891 F.3d 59, 65 (2d Cir. 2018) (quoting *Turley v. Police Dep't of the City of N.Y.*, 167 F.3d 757, 760 (2d Cir. 1999)); *but cf. Jayne v. Mason & Dixon Lines*, 124 F.2d 317, 319 (2d Cir. 1941) (Hand, J.) ("We do not mean to imply . . . that we should have thought it fatal . . . if no rational reconciliation of the verdicts was possible."); *Malm v. U.S. Lines Co.*, 269 F. Supp. 731, 731–32 (S.D.N.Y. 1967) (Weinfeld, J.) ("Inconsistent jury verdicts upon different counts or claims are not an anomaly in the law, which at times recognizes a jury's right to an idiosyncratic position, provided the challenged verdict is based on the evidence and the law."), *aff'd on the opinion below*, 378 F.2d 941 (2d Cir. 1967).[1] An inconsistency "exists only when a verdict on one claim necessarily

---

[1] Because the Second Circuit affirmed on the opinion below, Judge Weinfeld's "reasoning [became] the law of this Circuit." *See Rockefeller v. Powers*, 74 F.3d 1367, 1382 (2d Cir. 1995).

negates an element of another cause of action." *Barry v. Manglass*, 55 N.Y.2d 803, 805 (1981); *see also Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 86 (2d Cir. 2006).

Burris's claim that the verdict was inconsistent rests entirely on his assumption about what qualifies as sufficiently "extreme and outrageous" as to meet the elements of IIED. He makes it quite clear that only two actions by the officers could meet the standard for this rare tort: "[O]ther than the punching and the bullet insertion, there was no other evidence presented to the jury that would come close to meeting the elements of IIED." Mot. 7. This assumes that, if the jury found liability on IIED, it must have *also* believed that either the punching at Commack Road or the bullet insertion happened. The inconsistency then lies, says Burris, in the jury's failure to return a finding for assault or battery for behavior it must have believed was IIED. Burris also argues that it was "a compromise verdict and a miscarriage of justice" for the jury to award $1 in nominal damages for IIED, but no compensatory damages for the "severe emotional distress" that is a required element of that tort. Mot. 8.

The verdict in this case on the IIED claim was not inconsistent with the verdict on the other causes of action. First, as a matter of law, a verdict for Burris on the other causes of action—excessive force, assault, or battery—could only have been based on tortious physical contact. As charged in my instructions to the jury, all of the causes of action—except IIED— required such a finding. *See* Tr. 1292–95, 1301–05. The IIED claim shared no elements with these torts. Rather, my IIED charge simply outlined the component elements of this cause of action, which do not include physical conduct at all. Tr. 1304–05. The jury's failure to find in Burris's favor on the physical torts compels the conclusion that the jury did not believe Burris had been the victim of those acts. This is not surprising in light of the compelling evidence casting doubt on his entire account.

My view of the evidence suggests that the jury considered some action—by Det. Nicolic alone—to constitute IIED *other* than the punching or the bullet. The jury perhaps evaluated Det. Nicolic's alleged improper language, Tr. 482, or his participation in an arrest of a suspect who had a pending lawsuit against him, Tr. 298, 385–86, 396–97, 733, and believed this met the standard for IIED.[2] But the jury misunderstood the law. Burris concedes that neither of these examples, nor anything else aside from the beating and the bullet, "come close to meeting the elements of IIED." Mot. 7. My view best harmonizes the jury's "apparent inconsistency." *See Ali*, 891 F.3d at 65.

Moreover, each of the causes of action for these physical torts includes damages for mental anguish as part of compensatory damages. If the jury had found that excessive force, assault, or battery took place, it could have compensated Burris for mental anguish suffered as a result. *See* William L. Prosser, "Intentional Infliction of Mental Suffering: A New Tort," 37 MICH. L. REV. 874, 875 (1939). Indeed, I so charged the jury. Tr. 1310. The fact that it chose to award *only* nominal damages on the IIED claim is thus consistent with the jury's failure to find liability on the other causes of action. The award of $1 in nominal damages supports the notion that the jury did not believe the beating or the bullet insertion happened, and that whatever conduct it thought may have constituted IIED was inconsequential. *See Amato v. City of Saratoga Springs*, 170 F.3d 311, 314 (2d Cir. 1999) ("For instance, where a victim's claims of injury lack credibility, or where the injuries lack monetary value, a jury could reasonably award nominal damages."). The jury was charged without objection that if Burris had suffered "no

---

[2] Indeed, I even asked one of the witnesses, outside the presence of the jury, why Det. Nicolic would have been sent to arrest Burris under those circumstances. *See* Tr. 445–47.

injury as a result of a [particular] violation, then you must award nominal damages." Tr. 1310. Because the verdict was not inconsistent, I deny Burris's motion for a new trial on this ground.

Besides, the IIED claim should have never gone to the jury. Under New York law, such a cause of action does not lie where a plaintiff alleges other tortious conduct for which damages for mental anguish are available. As I observed during the trial, IIED "was intended for conduct that was not otherwise within some, did not fall within some other tort." Tr. 1331. *See Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) (Weinstein, J.). Indeed, the New York Court of Appeals, in dicta, has "questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability." *Fischer v. Maloney*, 43 N.Y.2d 553, 558 (N.Y. 1978). The Second Circuit has since held that "[a]ll four Appellate Division courts have answered the question and held that it cannot." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015). These cases are binding on Burris's state-law claims. *See West v. Amer. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances, a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court[.]").

B. Burris's Rule 59 Motion on the Grounds of Impermissible Expert Testimony

Burris has also argued that he is entitled to a new trial because I let the three treating physicians provide "improper expert opinion." Mot. 9. Again recounting his unsuccessful efforts to reopen discovery prior to the first trial, Mot. 9, Burris claimed that the physicians' answers regarding whether the bullet could move "upward" constituted an expert opinion, Mot. 10–12.

He suggested that because NUMC physicians "work every day with Nassau County police law enforcement," their testimony was a surreptitious effort to exonerate the defendants. Reply 7. Burris characterized the treating physicians' review of the x-rays as "expert opinion that went beyond their treatment of Plaintiff," Mot. 10, and "speculative," Mot. 12. Defendants countered that Burris had opened the door by introducing the x-rays and asking about the "normal" movement of objects in the digestive tract during his case-in-chief. Opp. 23.

Burris further claimed that I prejudiced the proceedings by asking questions of these physicians, and that I "explicitly developed the theory that Plaintiff should have expelled the bullet during a bowel movement and could have forced the bullet back into his own rectum." Mot. 12. Following from this, Burris claimed he had "no way to rebut the doctors' speculative, Defendant-friendly testimony." Mot. 12. He continued, "Whether the bullet should have been expelled during a bowel movement, whether foreign objects can move upward and whether the bullet could have been forced into the sigmoid colon by human fingers are all questions completely unrelated to Dr. Baxi and Dr. Kanth reading Plaintiff's x-rays," because they were only treating physicians, Mot. 13, and any opinion they gave was not formed "during the actual course of treating Plaintiff," Mot. 13–14.

*1. Burris's Claim, During Trial, that He Had Been Denied Expert Discovery*

Burris initially disclosed only one medical expert in support of his case, listed in the May 4, 2016 Joint Pretrial Order 6, Dkt. No. 80–1. He withdrew this expert's report in June 2016. Minute Order, June 17, 2016. Over six months later, Burris retained his current counsel, Dkt. Nos. 98–99, the third attorneys to represent him in this matter, Dkt. Nos. 35, 42, 89–90. In early February 2017, a trial date was set for late June 2017, Order, Feb. 2, 2017, and Burris's counsel moved unsuccessfully to reopen discovery at the end of March. Dkt. Nos. 103, 110. Specifically,

Burris asked to add a medical expert to testify as to "whether the bullet was ingested or inserted into Plaintiff's rectum and the physical impact of inserting or swallowing a bullet." Mem. Law in Supp. Pl.'s Mot. to Reopen Disc. and Amend the Joint Retrial [sic] Order ("Disc. Mot.") 5, Dkt. No. 104. Despite Burris's counsel's assertion during a sidebar at trial that they had attempted to "bring in an expert to come in and opine on this," Tr. 180, Burris's motion to reopen discovery did not claim that an expert would testify to contradict that the bullet would have passed when Burris moved his bowels, or to explain how the bullet appeared to move up.

On the second day of trial, I asked Burris's counsel if there would be a forthcoming "explanation as to how the bullet could move up." Tr. 179. Burris's attorney referred back to the denial of his motion to reopen discovery, Tr. 179–80, which did not seek expert testimony on this issue, *see* Disc. Mot. 5. This became a familiar exchange during the trial: I raised my concerns about this evidence; Burris's attorneys insisted they had been barred from calling a necessary expert; I explained that they could have added an expert, and I also explained that this crucial issue did not require expert testimony anyway when the physicians were perfectly capable of describing the x-rays and relying on their medical training—and common sense—to support their testimony. *See, e.g.*, Tr. 180–81, 819–20, 893–95, 896–98, 1073–74, 1088–91, 1093, 1162–63, 1194–97, 1098–99.

At one point, I told Burris's attorney he could call an expert. Tr. 180. At another point, after this had come up several times, I asked, "[W]hy you don't call your own expert?" Tr. 1073. At still other points, I reminded him that an entire trial had already been conducted, and yet counsel had chosen not to file another motion to add an expert to testify regarding this particular issue, nor had they appealed the discovery order. Tr. 1073, 1090–91, 1093, 1194–95, 1197. It is therefore hard to credit Burris's counsel's insistence that they had "made every effort to have our

own medical expert in here." Tr. 893. At no point—then or now—have Burris's attorneys explained what their proposed expert would have even testified to on this issue. *See, e.g.*, 896–97, 899, 1074, 1162–63, 1196–97.

Because of their perceived handicap in introducing expert testimony, Burris's counsel tried to resolve the issue during their cross-examination of Dr. Roman, when they attempted to impeach him using a case study, presumably found through last-minute Googling, about self-insertion of a bidet showerhead that cited some *other* report suggesting "that hard objects are potentially traumatic and tend to migrate upwards." Tr. 1079–80. They also attempted to introduce a report from something called the "Internet Journal of Surgery." Tr. 1084. I told counsel, three times, that this was just "not the way to do it." Tr. 1084, 1089, 1091; *see also* Tr. 1088–89 ("The Court: This kind of evidence, if you want to admit it, should be admitted through an expert witness of your own.") Ultimately, I allowed Burris's counsel to ask one of the questions that arose during the sidebar regarding this literature, and I read the question back in the presence of the jury: "Doctor, is it possible that a bullet the size of what you saw on that x-ray can move upward even though you have testified that it is not natural?" Tr. 1097. Dr. Roman replied, "It's possible though it's not natural." Tr. 1098. Counsel continued with a follow-up, without objection: "Doctor, is it possible for a bullet of the size that you saw in the x-ray that was shown to you to ascend from the anal canal into the rectum and then on to the sigmoid colon?", and Dr. Roman replied, "It's possible." Tr. 1098. It seems from this exchange that Burris ultimately got what he wanted. Significantly, as I observed earlier, this made no mention of how this bullet—which was positioned under fecal matter—could have moved upward through it.

## 2. The Physicians Did Not Provide "Expert" Testimony

A physician may be considered an expert witness when they are asked to testify regarding "specialized skill and knowledge." *Turner v. Delta Air Lines, Inc.*, No. 06 CV 1010, 2008 WL 222559, at *1 (E.D.N.Y. Jan. 25 2008). However, "a lay witness provides an opinion 'result[ing] from a process of reasoning familiar with everyday life.'" *Lamere v. N.Y. State Office for the Aging*, 223 F.R.D. 85, 87 (N.D.N.Y. 2004) (quoting Fed. R. Evid. 701 (Advisory Committee Notes, Amendment 2000)), *aff'd* No. 03-CV-0356, 2004 WL 1592669. Expert testimony must be disclosed prior to trial so that the opposing party is on notice of evidence it has to meet. *See* Fed. R. Civ. P. 26(a)(2)(A). Nevertheless, physicians may testify as fact witnesses about opinions they formed during the course of treatment without qualifying as experts subject to Rule 26. *See Cruz v. Henry Modell Co., Inc.*, No. CV 05-1450, 2008 WL 905356, at *13 (E.D.N.Y. Mar. 31, 2008). This testimony may include the physician's opinions about the cause of the patient's condition. *See Spencer v. Int'l Shoppes, Inc.*, No. CV 06-2637, 2011 WL 4383046, at *4 (E.D.N.Y. Sept. 20, 2011). While a physician may not testify on the basis of "information acquired from outside sources," *Mangla v. Univ. of Rochester*, 168 F.R.D. 137, 139 (W.D.N.Y. 1996), a treating physician's testimony may include "anything that has come within their professional scope as a treating physician such as probable causes, past and present conditions, and future treatments." *Greenfield v. Mem. Sloan Kettering Hosp.*, 95 Civ. 7658, 2000 WL 351395 at *6 (S.D.N.Y. April 5, 2000).

The physicians' testimony here concerned opinions formed during treatment and was within the scope of the medical training that informed that treatment. The training that guides a physician's ability to treat the patient in front of her is hardly an "outside sourc[e]," *Mangla*, 168 F.R.D. at 139, but rather the whole of her medical knowledge, which she then brings to bear. *See*

Tr. 890 ("The Court: And, you know, doctors go to medical school for four years. Later on they may specialize, but they learn about the functioning of most of the body. . . . And I actually think that you don't even need to be a doctor to figure out most of what she has testified to."). Drs. Baxi and Kanth were radiologists who read the x-rays at NUMC, and their testimony focused on the location of the bullet with respect to the fecal matter—or lack thereof—as depicted on the x-rays. Dr. Roman reviewed the x-rays while Burris was in the emergency room, and testified regarding the medical records, which suggested Burris had inserted the bullet himself. Tr. 1051–52. When these doctors discussed the movement of the bullet within Burris's abdomen, they were referring to what they observed while treating Burris and from reading his NUMC records. This included Dr. Roman's reading the following observation from Burris's gastroenterology consultation, which was part of the medical record Burris introduced: "Foreign body should be passed spontaneously with bowel movement." Tr. 1050; *see* Def. Ex. B-89, Dkt. No. 205. These physicians conveyed only general medical knowledge, which informed their treatment and was justified by common sense: objects move down and out. Tr. 158, 875, 876, 913, 1133, 1137. And Dr. Kanth was careful not to testify beyond that, *see, e.g.*, Tr. 879 ("That's outside the scope of what I do. I am interpreting the films as they are."), 905, 913, or overstate the general principle, Tr. 876 (Q: "So it's just not scientifically possible for this bullet to go from here to here after someone has a bowel movement?" A: "It doesn't follow what usually happens."). Even Burris's own attorneys questioned these physicians regarding broader phenomena that would explain the x-ray evidence in their client's favor. *See, e.g.*, Tr. 158, 901, 1070, 1099. I do not believe these physicians' medical affirmation of common sense constituted an expert opinion, let alone an improperly undisclosed one.

Moreover, even if these opinions did not "result[] from a process of reasoning familiar in everyday life." Fed. R. Evid. 701 (Advisory Committee Notes, Amendment 2000), and were beyond the scope of Burris's treatment, there is no per se rule that requires reversal of a verdict due to erroneous admission of such testimony. Indeed, the Second Circuit has "consistently held that erroneous evidentiary rulings, including rulings regarding expert testimony, are reviewed under the 'harmless error' standard." *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 183 (2d Cir. 2004); *see also Parker v. Reda*, 327 F.3d 211, 213 (2d Cir. 2003).

Burris alleges that this testimony failed to satisfy the requirement of an "expert report under Rule 26." Mot. 12. This argument fails, because Burris was not entitled to such an "expert report." Specifically, such a written report is only required "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). These NUMC physicians do not fall within the scope of this rule. Moreover, all three were Burris's witnesses in the first trial, and all three were disclosed on the Joint Pretrial Order before this trial. Proposed Pretrial Order 11, Dkt. No. 167.

Although Burris claims that there was "no way to rebut the doctors'" testimony, Mot. 12, Burris had already had an expert, Dkt. No. 108, who he curiously declined to call at either trial. I repeatedly told him that I would permit him to call an expert at the trial to rebut the physicians' testimony. Instead of taking me up on this offer, he attempted to cross-examine Dr. Roman with medical case reports from sources whose reliability was not properly established, *see* Fed. R. Evid. 803(18), insisting that "this was the only way" to rebut the physicians' testimony because he had been denied his expert. Tr. 1089. While I excluded the reports, I permitted his counsel to ask questions which elicited the concession Burris appeared to want. Tr. 1097–98. To this day,

Burris has not provided either a report, an affidavit, or even an offer of proof as to what this "expert" would testify to. Such a submission should be required if he demands a new trial on this ground. Otherwise, a new trial would simply be a repeat of what happened here.

   3.   *The Court's Questions to the Experts*

       Burris also took issue with my efforts to clarify the physicians' testimony. But the court is permitted to ask questions. Fed. R. Evid. 614(b). Only in rare cases is improper questioning by a trial judge grounds for a new trial under Rule 59. Wright & Miller § 2809 n.8. "Unquestionably, bias and improper conduct by a trial judge may be grounds for a new trial if a party was unfairly prejudiced. Active participation by a district judge in trial proceedings, however, is in itself neither improper nor unfair." *Desjardins v. Van Buren Cmty. Hosp.*, 969 F.2d 1280, 1281 (1st Cir. 1992). Therefore, a judge may not say, "And I now am going to tell you what I think of the defendant's testimony. . . . I think that every single word that man said, except when he agreed with the Government's testimony, was a lie," nor may a judge "distort [evidence] or add to it." *Querica v. United States*, 289 U.S. 466, 468, 470 (1933). But that is far different from asking questions which "assure that the issues are clearly presented to the jury." *United States v. Vega*, 589 F.2d 1147, 1152 (2d Cir. 1978).

       My questioning was exactly of this latter sort. Burris's argument that my questions were prejudicial relies exclusively on a mischaracterization of my questions to Dr. Kanth, claiming that I had asked her "how far someone would have to push the bullet with their fingers to get in the location seen in the [first] x-ray," citing to pages 886–87 of the trial transcript. Mot. 11. This is not what I asked. We discussed this exact colloquy at a sidebar shortly following my question. My exact question was, "[H]ow far up—in other words, let's use my finger, maybe two and a half inches, I don't know, how far up would one have to push in order to get it to that point

shown on the x-ray?" Tr. 886–87. When Burris's counsel objected at sidebar, he claimed that I

had asked "how far up could a human finger push the object," and I replied, "I didn't ask that

question." Tr. 892. I explained, "I just wanted to know, essentially get an idea of how far up this

was, and so I asked could you tell from its location—you know, as I said, my finger is two and a

half inches, I don't know, maybe it is more—how high it was and she said two to three what,

centimeters, which she converted to one and a half inches. . . . That's all I asked." Tr. 892–93.

This colloquy did not "explicitly develop[] the theory that Plaintiff should have expelled the

bullet during a bowel movement and could have forced the bullet back into his own rectum,"

Mot. 12, for which there was testimony, including the gastroenterologist's treating notes. *See

also* Mot. 13 (characterizing elicited testimony as "whether the bullet could have been forced

into the sigmoid colon by human fingers").

Moreover, while I asked some questions about the x-rays and medical testimony in front

of the jury, *see, e.g.*, Tr. 158, 169–70, 886–88, I only raised my concerns about the evidence

outside the presence of the jury, *see, e.g.*, Tr. 181, 513–14, 519, 643, 890–91, 1161. And when it

came time to charge the jury, I was careful to instruct them to disregard anything I might have

asked during the trial:

> Nothing I have said or done in the course of this trial should be taken by you as
> expressing an opinion on my part about any aspect of the facts of this case, the
> credibility of the witnesses, or the weight to be given [to] any of the evidence. Even
> if in some way I should have left an impression that I have some opinion, it would
> be your duty to disregard it. You are the sole judges of the facts. On occasion, I may
> have asked questions of a witness. You should attach no significance to these
> questions because they were asked by the Court.

Tr. 1282. My questions throughout the trial were well within the range of what a trial judge is

allowed and expected to do in order to "assure that the issues are clearly presented to the jury."

*Vega*, 589 F.2d at 1152. The jury is presumed to have followed my instruction, which was more

than sufficient to eliminate any potential misimpression. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Burris is not entitled to a new trial on this ground.

## II.    *The Defendants' Post-Verdict Motions Under Rules 50 and 59*

The foregoing discussion does not dispose of the matter entirely, because it still leaves standing the IIED verdict, along with the defendants' motions directed toward that verdict, on which I reserved decision. Tr. 1156, 1167, 1352–53. Burris argues that because "[d]efendants filed no post-trial motions [separate from their post-verdict motions] . . . [t]he time has passed for Defendants to move for judgment as a matter of law or alter the judgment." Reply 1. Although defense counsel did not brief his pre- and post-verdict motions in writing, oral motions are permitted under Rule 50, especially where a colloquy fleshes out the issues. *See* Wright & Miller § 2533 ("Although it is said that the better practice is for the motion to be in writing, the rule contains no such requirement and an oral motion based on the record will suffice. . . . Indeed, it is not essential that there be a formal motion under Rule 50 at all."); *see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 287 (2d Cir. 1998).

I grant the defendants' motion pursuant to Rule 50, on the ground that the conduct the jury found constituted IIED is insufficient under New York law to sustain this cause of action. And, as Burris concedes, the only evidence he thinks meets the standard for this claim is tortious *physical* conduct, which the New York courts have held cannot also support an IIED claim. If I did not grant the Rule 50 motion, at the very least, I would grant a new trial on the IIED claim alone, because the jury's finding is against the weight of the evidence and a manifest injustice. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 261 (2d Cir. 2002) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)).

Burris's testimony at trial was inconsistent, incredible, and perjurious. There was testimony that Burris had admitted he had "shoved a bullet up his ass" to concoct a case against the officers. *See* Tr. 775–76. The gastroenterologist even suspected Burris had inserted the bullet himself, and medical records indicated yet a different story—that Burris had blamed the bullet assault on an inmate. Burris denied having a bowel movement until his sixth day in the hospital. Three different doctors interpreted Burris's x-rays, showing that he had indeed had a bowel movement on his first day, and that after that, the bullet had moved *up* into his colon. The only way this could have happened was if Burris reinserted the bullet himself. I need not review the countless other inconsistencies. The evidence—including Burris's own medical records—compellingly suggests that Burris "is a liar and a fraud." *Amorgianos*, 303 F.3d at 263. The only verdict in Burris's favor, on the IIED cause of action, reflected the jury's rejection of Burris's claims of excessive force, assault, and battery. And the $1 it awarded reflected the fact that the jury believed Burris suffered no damage, even on the sole cause of action for which it found for Burris.

## Conclusion

Burris's motion for a new trial under Rule 59 is denied. Defendant Anthony Nicolic's motion under Rule 50 for judgment as a matter of law is granted. The clerk is directed to enter a judgment in favor of all of the defendants.

**SO ORDERED.**

Brooklyn, New York
August 24, 2018

*Edward R. Korman*
Edward R. Korman
United States District Judge